**Opinion issued October 18, 2018**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-17-00436-CV

———————————

## MONICA NICOLE TOWNSEND, Appellant

## V.

## ERIK ALLEN VASQUEZ, Appellee

---

**On Appeal from the 300th District Court**
**Brazoria County, Texas**
**Trial Court Case No. 63976**

---

## O P I N I O N

Monica Townsend and Erik Vasquez are the parents of a child, C.V. After their 2012 divorce, a court entered an agreed order that the parents would be C.V.'s joint managing conservators and that Monica would have the exclusive right to determine C.V.'s domicile.

Erik initiated this suit, seeking to modify the conservatorship order to grant him the exclusive right to determine C.V.'s domicile. After a bench trial, the trial granted Erik's requested modification. In four issues, Monica challenges the trial court's actions. We affirm.

**Background**

Erik and Monica divorced in 2012, and the court entered an agreed custody order providing that C.V.—then almost six years old—would live with Monica and that Erik would exercise standard visitation rights. The order also named both parents as joint managing conservators. It gave Monica the exclusive rights to determine C.V.'s domicile and to direct C.V.'s education and gave both parents the shared right to jointly direct C.V.'s medical and psychiatric care. Monica and either Erik or his relatives would meet at a designated place to transfer C.V. for visitation.

Things changed around 2015, when Monica began refusing to transfer C.V. at the designated place until a police officer was present. Erik then initiated this suit to change the visitation-transfer location to a local police department, in accordance with Monica's wishes to have a police officer present. Monica counter-petitioned to have Erik's future visitation periods supervised and to be named as sole managing conservator. Erik later amended his petition to seek the exclusive right to determine C.V.'s domicile. Both parents alleged that a material

and substantial change in their and C.V.'s circumstances supported a modification. *See* TEX. FAM. CODE § 156.101(a)(1)(A).

By Rule 11 agreement, which was later entered as the court's temporary order, Erik and Monica agreed to the appointment of a licensed psychologist, Dr. Marie Alvarez, to evaluate C.V. and his living situations with each parent.

The parties tried the case without a jury. Though the suit was pending before the 300th District Court of Brazoria County, the elected judge of the Brazoria County County Court at Law No. 3 presided over the trial.

At trial, Erik called several witnesses in support of his requested modification. He testified first, explaining that he has remarried and lives with his wife and his other biological sons for about two years. His parents live in a different home on the same property. His parents help care for C.V. during visitation periods, and C.V. gets along with his half-siblings. Erik's wife takes C.V. to school from time to time too, and the family takes trips and goes fishing together.

Erik testified that until recently his visitation with C.V. generally went well. He helps C.V. with his homework, and he tries to learn about C.V.'s grades. He eats lunch with C.V. at school on occasion. And he enjoys fishing with C.V., watching C.V. playing basketball at the YMCA, and going to movies with C.V.

Erik testified that Monica's and her mother's conduct in 2015 and 2016 changed things. According to Erik, he stopped the school lunch visits because Monica's mother would also show up and chill C.V.'s interaction with him. Monica requested that Erik undergo drug and alcohol testing, and all tests were negative. Though the most recent summer visitation went well, CPS investigated Erik anyway. He also testified that Monica has been trying to turn C.V. against him—trying to "brainwash" him—and he feared that her efforts would continue absent a custody modification.

Erik admitted, though, that he had not attended any meetings with school personnel to address C.V.'s performance[1] or C.V.'s appointments with medical and psychiatric caregivers. He does not know whether C.V. needs to take any medication. No medication comes with C.V. during scheduled visitations, and C.V. has only taken Tylenol during his visits. He has not read C.V.'s school or therapy records, though he could have. He also admitted his 2005 and 2006 convictions for family violence against Monica. Finally, he admitted that Monica is not a bad mother, she would never intentionally harm C.V., and his only concern about C.V. continuing to live with Monica is her attempt to undermine Erik's relationship with C.V.

---

[1]     C.V.'s school grades have lowered during this suit but, closer to trial, started to rebound after meetings with school personnel.

4

Erik's mother, Pauline Moeller, also testified. She picks up C.V. frequently at the visitation exchanges, and C.V. often stays with her on Friday evenings while Erik is still working, before spending the rest of the weekend with Erik and his family. Pauline takes C.V. out to eat, goes to movies with him, and lets him ride a four-wheeler on their property. C.V. seems happy spending time with both her and Erik. C.V. now gets along with Erik's other children, though she acknowledged some early tension. C.V. told her of one incident when C.V. saw his mother strip naked while drinking alcohol and smoking.

Pauline also described how Erik used to drink alcohol in front of C.V. and how C.V. told her that people drinking in front of him scared him. According to Pauline, no medication is sent with C.V. for his visitations.

Dr. Alvarez, a licensed psychologist, testified that she performed a psychological and custody evaluation of C.V. and his extended families. She conducted several lengthy interviews with C.V., Monica, and Erik, sometimes including C.V. together with one or the other parent.

Dr. Alvarez noted some problems in Monica's story. Monica frequently accused Erik of family violence against both herself and C.V., and while there were two convictions for family violence in 2005 and 2006, Monica's post-divorce accusations appeared to Dr. Alvarez to be riddled with inconsistencies. Many of Monica's responses were untruthful or were intended to deny or mask "problems,

5

pathology, and personality difficulties." Monica could not keep her stories straight and underreported personality factors and associated pathology. Dr. Alvarez concluded that Monica likely "has a lot of self-esteem and a lot of low confidence issues" and suffers from some psychopathologies, including frequent untruthfulness; agenda-driven interactions with others; "under-report[ing] the common faults that the vast majority of the adult population readily admits having"; moderate anxiety; somatization; possible depression; "attention-seeking and dramatic"; and narcissism. But, according to Dr. Alvarez, Erik has no "significant psychological disorders," save for some narcissism and obsessive-compulsive behaviors.

In contrast, Dr. Alvarez had confidence in Erik's truthfulness and found that he had no significant psychological disorders, with parenting scores within the normal range. Erik expressed concern over Monica's alcohol and substance abuse and attempts to sabotage his relationship with C.V. Dr. Alvarez corroborated Erik's concern, concluding that many of C.V.'s statements about his father's "drinking or being mean" or alleged abuse "came directly from" Monica. In Dr. Alvarez's view, Monica was attempting "to influence or alienate [C.V.] from his father by talking to him in ways that will affect" the parent-child relationship. Specifically, Dr. Alvarez opined that Monica's push to have a police officer present at visitation exchanges "is a form of parental alienation." According to Dr.

6

Alvarez, children need healthy relationships with both their parents and alienation attempts can qualify as abuse.

Dr. Alvarez noted positives about C.V.'s home life with Erik. Erik's mother and her husband are involved in C.V.'s life. C.V. behaves better when with his father. C.V.'s relationship with his father has improved over time, and C.V.'s emotional connections to his father and his mother are equal.

Dr. Alvarez concluded that Erik should be given the exclusive right to determine C.V.'s domicile and to direct C.V.'s medical and psychological care, with joint managing conservatorship and standard possession for Monica. The amicus attorney for C.V. joined Dr. Alvarez's recommendations.

Erik's wife, Shannon Vasquez, and his stepfather, Thomas Moeller, also testified in support of Erik's position, noting how happy C.V. is with Erik and his family and how they stay involved in C.V.'s life. Shannon indicated her willingness to co-parent C.V. with Monica and participate in counseling to that end.

Monica testified too. She sees many problems with Erik's parenting and visitation periods. For a time, C.V. returned from visitation periods anxious, sad, angry, or aggressive and even had panic attacks. She would surreptitiously record C.V.'s phone calls with his father.

She sends C.V. to a therapist for PTSD, anxiety, ADHD, skill-building, and learning difficulties. C.V. has received therapy also because he saw Erik physically assault Monica in the past. Monica explained that C.V. will lose access to these services if he moves from Fort Bend County to Brazoria County, where Erik lives. Monica also complained that C.V. once was bitten by a dog when playing outside near Erik's stepfather's property, but no one notified her or sent her medical records of C.V.'s treatment.

Monica testified that she has taken care of virtually all of C.V.'s school, medical, and psychiatric needs over the years. She has helped C.V. as he has improved his school grades and attendance, participating in many meetings with school counselors with C.V. while Erik has not. She has completed three parenting classes in connection with this suit and has used what she learned in parenting C.V.

Monica explained that she began requiring a police presence at visitation transfers because some of Erik's family would be "aggressive" toward her at the exchange or at her job. And though she requested that Erik be tested for drugs and alcohol during his visitation periods, Monica acknowledged that the tests were negative and that she is no longer concerned about C.V.'s safety with Erik. Notwithstanding C.V.'s past concerns about Erik's wife and other children, C.V. has expressed contentment to Monica about staying with his father. Monica admitted that C.V. loves and gets along well with Erik and his family.

Monica's mother also testified, and she acknowledged that C.V. loves Erik, that C.V. increasingly looks forward to seeing Erik, and that C.V. comes back to Monica a happy child after visits with Erik.

The trial court granted Erik's requested modification. The court awarded Erik the exclusive right to determine C.V.'s domicile within Brazoria County and contiguous counties, named both parents joint managing conservators, and awarded Monica only a standard visitation arrangement. She challenges these modifications on appeal.

### Objection to Referral to Associate Judge

The trial on the merits of a Family Code section 156.101 modification proceeding may be referred to an associate judge unless a party objects to the referral in writing. *See* TEX. FAM. CODE § 201.005(b). In her first issue, Monica contends that her written, pre-trial objection to an associate judge precluded the judge of the Brazoria County County Court at Law No. 3 from presiding over the trial on the merits. Monica's contention turns on whether the judge of the County Court at Law No. 3 is an "associate judge," a term that is undefined in the Family Code.

Section 201.001 of the Family Code governs the appointment of associate judges. Generally, an associate judge is appointed by the district or county court judges whom the associate judge will assist. *See* TEX. FAM. CODE § 201.001(a)–(e)

9

(providing circumstances under which associate judge may be appointed); *id.* § 201.007(a)–(e) (providing powers that associate judge exercises, for example, conducting hearings and hearing evidence). Associate judges are compensated as determined by the county commissioners' court (or courts) from the county (or counties) whose judges the associate judge serves. *See* TEX. FAM. CODE § 201.003(a)–(d). Associate judges are not elected. They do not have their own courts; they assist duly elected judges. And associate judges' "employment" is terminable "at the will of" or "by a majority vote of" the judge or judges that the associate judge serves. *See* TEX. FAM. CODE § 201.004(a)–(d).

In contrast, the judgeship for the County Court at Law No. 3 is created by Government Code section 25.0221(3). A person attains this judgeship either by election or by appointment in the event of a vacancy. *See generally* TEX. CONST. art. V, § 30 (requiring all "Judges of all Courts of county-wide jurisdiction heretofore or hereafter created by the Legislature" to be elected); TEX. GOV'T CODE § 25.0009(a)–(c) (providing for appointment of county court at law judges in event of vacancy); *cf. Fashing v. El Paso Cty. Democratic Exec. Comm.*, 534 S.W.2d 886, 888–90 (Tex. 1976) (applying Texas Constitution article V, section 30, in suit concerning county courts at law). A county court at law judge exercises certain powers specific to that office. *See* TEX. GOV'T CODE § 25.0004(a)–(g). The judge is compensated by the county commissioners' court, subject to a statutory

10

compensation floor. *See* TEX. GOV'T CODE § 25.0005(a), (d). And the judge may be "removed from office" only under certain conditions and through certain procedures. *See* TEX. CONST. art. V, § 1-a(6) (governing removal of county judges from office); TEX. GOV'T CODE § 25.0006(b) (providing for removal of county court at law judges from office "in the same manner and for the same reasons as a county judge"). The Brazoria County County Court at Law No. 3 exercises the jurisdiction conferred on it by Government Code sections 25.003 and 25.0222, which includes jurisdiction over family-law cases.

A referral usually confers on an associate judge the power to hear a trial on the merits of a modification suit pending before a district court. *See generally* TEX. FAM. CODE §§ 201.005–.007. In contrast, a county court at law judge may hear a trial on the merits of a modification suit pending before a district court under an independent grant of authority—one that does not require a referral. *See* TEX. GOV'T CODE § 74.094(a); *Camacho v. Samaniego*, 831 S.W.2d 804, 811 (Tex. 1992) (remarking that Government Code section 74.094(a) "allow[s] a statutory county court judge to hear, determine, and sign a judgment in a matter pending in district court outside his court's jurisdiction without transferring the case"). Section 74.094(a) empowered the judge of the County Court at Law No. 3 to preside over the trial of this suit.

11

Comparing the two sets of provisions that create, empower, compensate, and govern the termination of associate judges to the analogous provisions for the judge of the County Court at Law No. 3, we hold that a county court at law judge who sits for another judge is not an "associate judge" as contemplated by Family Code section 201.005. The two offices are governed by distinct provisions. And the judge here could hear the bench trial on the merits under Government Code section 74.094(a), without need of the authority contemplated by the Family Code's referral-unless-objected-to provisions.

Monica also argues that the "case should have been tried by the referring judge rather than the associate judge. The associate judge lacked jurisdiction." We do not consider this to be a challenge to the 300th District Court's jurisdiction over this suit. That court undisputedly had jurisdiction over this family-law case. *See* TEX. GOV'T CODE §§ 24.601, 24.608. The suit was filed in, and was never transferred out of, the 300th District Court. Government Code section 74.094(a) empowered the judge of the County Court at Law No. 3 to preside over the trial while the suit was still pending before the 300th District Court.

We therefore overrule Monica's first issue.

**Rule of Civil Procedure 306**

In her second issue, Monica contends that the trial court's modification order fails to comply with Rule of Civil Procedure 306. Rule 306 requires that a

12

judgment "state the specific grounds for termination or for appointment of the managing conservator" if the suit is one either "for termination of the parent-child relationship or a suit affecting the parent-child relationship filed by a governmental entity for managing conservatorship." TEX. R. CIV. P. 306. This suit is neither. We therefore overrule Monica's second issue.

**Order Modifying Conservatorship—C.V.'s**
**Best Interest and Evidence Sufficiency**

Monica also challenges the trial court's decision to grant Erik the exclusive right to determine C.V.'s residence within Brazoria County and contiguous counties. In her third issue, Monica contends that the trial court abused its discretion in making a modification that is not in C.V.'s best interest. In her fourth issue, Monica contends that the modification was an abuse of discretion because the evidence is legally and factually insufficient. We consider the two issues together, given the standard of review and applicable law.

## I.      Standard of review and applicable law

A trial court's order modifying the parent-child relationship is reviewed for an abuse of discretion. *Stamper v. Knox*, 254 S.W.3d 537, 542 (Tex. App.—Houston [1st Dist.] 2008, no pet.). Such an order will be disturbed only when it is clear that the court acted in an arbitrary or unreasonable manner, without reference to any guiding principles. *Id.*

Under the abuse-of-discretion standard applicable to orders modifying the parent-child relationship, legal and factual sufficiency are not independent grounds of error but are relevant factors in assessing whether the trial court abused its discretion. *Id.* Review in this context is two-pronged: a reviewing court determines whether the trial court (1) had sufficient information on which to exercise its discretion and (2) erred in applying its discretion. *Id.* Traditional sufficiency review comes into play under the first prong. *Id.*

To determine legal sufficiency of the evidence, a reviewing court determines whether the evidence would enable reasonable people to reach the judgment being reviewed. *Id.* The reviewing court must consider the evidence in the light most favorable to the trial court's decision and indulge every reasonable inference that would support it. *See Epps v. Deboise*, 537 S.W.3d 238, 242–43 (Tex. App.—Houston [1st Dist.] 2017, no pet.). The reviewing court considers favorable evidence that a reasonable factfinder could consider and disregards contrary evidence unless a reasonable factfinder could not disregard it. *Stamper*, 254 S.W.3d at 542. If the evidence allows for only one inference, the reviewing court may not disregard it. *Epps*, 537 S.W.3d at 243.

To determine factual sufficiency, a reviewing court considers all of the evidence that either supports or contradicts the factfinder's determination. *Id.* The factfinder's finding is set aside only if the evidence supporting it is so contrary to

14

the overwhelming weight of the evidence as to be clearly wrong or unjust. *See id.* The reviewing court may not simply substitute its judgment for the factfinder's; the factfinder is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Id.*

In a bench trial, the trial court, as the trier of fact, is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Hatteberg v. Hatteberg*, 933 S.W.2d 522, 530 (Tex. App.—Houston [1st Dist.] 1994, no writ). The trial court may choose to believe some witnesses over others. *Martinez v. Lopez*, No. 01-09-00951-CV, 2011 WL 2112806, at *4 (Tex. App.—Houston [1st Dist.] May 26, 2011, no pet.) (mem. op.).

Once the evidence is reviewed in the proper legal- and factual-sufficiency contexts under the first prong, a reviewing court considers under the second prong whether the trial court erred in applying its discretion because it made an unreasonable decision. *Stamper*, 254 S.W.3d at 542. Ultimately, there is no abuse of discretion as long as some evidence of a substantive and probative character exists to support the trial court's decision. *Id.*

A trial court may modify the terms of a conservatorship order if the party requesting the modification shows both that there has been a material and substantial change warranting the modification since the date of the last conservatorship order and that the modification is in the child's best interest. *See*

TEX. FAM. CODE § 156.101(a); *Epps*, 537 S.W.3d at 243. The child's best interest is the court's primary consideration. TEX. FAM. CODE § 153.002.

A non-exhaustive list of factors guides a reviewing court about the child's best interest. *Epps*, 537 S.W.3d at 243. Those factors are (1) the child's desires, (2) the child's emotional and physical needs now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the child's best interest, (6) the plans for the child by the individuals seeking custody, (7) the stability of the home or proposed placement, (8) the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the parent's acts or omissions. *Id.*

## II. Legally and factually sufficient evidence exists, giving the trial court sufficient information on which to exercise its discretion

First, we review the evidence under each of the nine factors that guide review of a best-interest finding. We use the factors to determine whether legally and factually sufficient evidence supports the trial court's ruling.

### A. C.V.'s desires

C.V. did not testify, and no witness testified that C.V. has expressed a custody preference. Several witnesses offered testimony that supports a determination that C.V., at a minimum, has no objection to his father having

16

custody. Erik, Pauline, and Shannon described how C.V. gets along well with his extended paternal family. Monica agreed that the paternal familial relationships were good. Monica's mother, too, admitted that C.V. loves Erik, that C.V. increasingly looks forward to seeing Erik, and that C.V. comes back to Monica a happy child after visits with Erik. C.V. enjoys activities with his father, including playing outside, fishing, and going to movies. Notwithstanding her prior concerns about C.V. living with Shannon and Erik's and Shannon's children, Monica admitted that C.V. has still expressed interest in staying with Erik, that C.V. has fun around Erik, and that things are better between C.V. and Shannon now. Finally, Dr. Alvarez concluded that C.V. is equally emotionally connected to both parents.

In response, Monica asserts that C.V. told Dr. Alvarez that he wants to keep living with Monica. She offers no record support for that assertion, and we find none. In fact, Monica testified that she is not aware of anyone having asked C.V. who he wanted to live with. Monica references Dr. Alvarez's testimony about C.V.'s therapist's deposition. Dr. Alvarez noted that, during a drawing exercise with the therapist, C.V. was asked which of two barns a horse should go in, understanding that the horse could not stay in both barns. One barn said "Mom" and the other "Dad." C.V. chose the "Mom" barn. Finally, Monica points to a statement made by the therapist during her deposition that C.V. "is worried about

17

having to live with his dad if that were to be the case, that he wants to stay with his mom."

The trial court could have discounted the drawing exercise and deposition statement by C.V.'s therapist for at least two reasons. First, Dr. Alvarez reviewed this information and still recommended that C.V. live with Erik. Second, Monica has, according to Dr. Alvarez, alienated C.V. from his father.

We conclude that this factor is neutral.[2]

**B.      C.V.'s emotional and physical needs now and in the future**

Much of the trial concerned Monica's efforts to alienate C.V. from Erik and the resulting emotional harm to C.V. Based on interviews with C.V., Monica, and Erik, Dr. Alvarez noted "an attempt by Ms. Townsend to influence or alienate [C.V.] from his father by talking to him in ways that will affect" the father-son relationship. Both Erik and Dr. Alvarez were concerned by Monica's behavior.

Dr. Alvarez concluded that many of Monica's allegations against Erik after the 2012 custody order—allegations of physical abuse against Monica and

---

[2]     Monica also asserts that "Family Code 153.008 allows [a] child 10 years of age or older to state a preference for managing conservator." That statute was repealed in 2009, however, before this suit was filed. *See* Act of May 29, 2009, 81st Leg., R.S., ch. 1113, § 31, 2009 TEX. GEN. LAWS 3056, 3072; Act of May 29, 2009, 81st Leg., R.S., ch. 1118, § 10, 2009 TEX. GEN. LAWS 3078, 3082. The current statute, Family Code section 153.009, allows, but does not require, a court to interview in chambers children under 12 years of age to determine the child's living preference. C.V. was 10 years old at the time of trial. There is no record of any such interview in the record before us.

18

improper drinking around C.V.—were too riddled with inconsistencies to be true. Monica caused Erik to be subjected to drug and alcohol testing, he passed the tests, and the tests were discontinued. Monica admitted that Erik has since quit drinking around C.V. and that she no longer worries that C.V. is unsafe with Erik because of drug or alcohol abuse.

Monica's attempted alienation and untruthfulness led Dr. Alvarez to conclude that C.V. was better off living with his father and with Monica having a standard possession order. The amicus attorney for C.V. agreed.

Monica responds by pointing out her care and support for C.V. for his entire life, including as it relates to school activities, medical care, and psychiatric care. She has been C.V.'s primary caregiver, and C.V. is attached to her. But Erik wants to assume that role, and has the support of other family members to assist him.

This factor favors Erik.

### C. Emotional and physical danger to C.V. now and in the future

Dr. Alvarez's testimony about Monica's attempt to alienate C.V. from his father—which Dr. Alvarez testified that some psychologists refer to as child abuse—suggests emotional danger to C.V. now and in the future if C.V. continued to reside primarily with Monica. Dr. Alvarez testified that children's psychological development "is negatively impacted and developed by parents that work to alienate the parent from one parent." She opined that Monica's explanation to C.V.

19

about the need for a police presence at visitation exchanges created a psychological framework that communicated to C.V. that Monica was "so afraid of Mr. Vasquez that they can't meet at any other place. And that is a form of parental alienation trying to influence the relationship between [C.V.] and his father by presenting Mr. Vasquez as an abusive monster." Monica did have reason for these beliefs—Erik had been convicted twice of domestic abuse against her before C.V.'s birth, and she testified that C.V. had witnessed his parents in a physical altercation. But Monica herself undercut this rationale. She testified that she asked for custody exchange at the police station because Erik's family acted aggressively toward her at prior exchanges. Erik himself rarely was present for the exchanges. And Monica later testified that she no longer believes that Erik puts C.V. in danger or that his visitations need to be supervised.

Monica also suggests that statements by C.V. to his therapist show that he has been afraid of Erik, feels unsafe in Erik's home, and has been mistreated by Shannon. These are the kind of allegations that Dr. Alvarez testified to as being fed by Monica to C.V. in order to alienate him from his father. The trial court, as sole judge of witness credibility in this bench trial, was entitled to believe Dr. Alvarez on this topic. *See Epps*, 537 S.W.3d at 243; *Martinez*, 2011 WL 2112806, at *4; *Hatteberg*, 933 S.W.2d at 530.

This factor favors Erik.

**D.    Erik's and Monica's parental abilities**

Monica has been C.V.'s primary caregiver his whole life, in part because C.V. has not lived with Erik for most of his life. She is involved in C.V.'s schooling and in improving his grades. She has borne the greater share of taking care of C.V.'s medical needs. Erik has been largely absent from those efforts. During this suit, Monica also completed several parenting classes and used what she learned to improve her parenting.

Dr. Alvarez compared Erik's and Monica's parental abilities. Erik's scores were within the normal range, while Monica's interviews were beset by inconsistencies and attempts to mask pathologies and problems. Dr. Alvarez also opined that C.V. behaves better when with Erik.

Based on Dr. Alvarez's testimony, we conclude that this factor slightly favors Erik.

**E.    Programs available to assist Erik or Monica in promoting C.V.'s best interest**

Monica ensured that C.V. has received therapy for several years, and she has regularly attended meetings with school personnel to address C.V.'s low-but-improving school performance. Therapy helped C.V. address concerns about his interactions with Shannon and other children. It also helps C.V. work through issues relating to PTSD, anxiety, ADHD, and learning difficulties. Living with Erik outside of Fort Bend County will preclude C.V. from using the same

therapist's services because that therapist only serves Fort Bend County residents. Erik has never reached out to the therapist Monica retained for C.V.

Monica has also attended meetings with school personnel to address C.V.'s performance. In contrast, Erik had limited involvement with helping C.V.'s school performance, even though online tools were available to him to monitor C.V.'s performance.

Erik responds that all the "programs available to promote the best interests of the child are equally available to both parents." Not so when it comes to the therapy and skill-building offered by C.V.'s longtime therapist and her office. Erik also points out that the trial court's order provides that both parents have the right, subject to the other's agreement, to consent to medical and psychological treatment for C.V. True enough, but that does not address that Monica has obtained therapy and school help for C.V. while Erik has not.

This factor favors Monica.

### F.    Erik's and Monica's plans for C.V.

Both parents claim that they are better suited to prepare C.V. for his future. Monica has invested significant time helping C.V.'s education and obtaining therapy for him. Dr. Alvarez interviewed each parent several times and concluded that C.V. was better off living with his father. She concluded that Monica

attempted to alienate C.V. from his father and that she showed troubling psychopathologies.

Given the recommendations of Dr. Alvarez, a neutral licensed psychologist, this factor favors Erik.

**G.    The stability of Erik's home**

Dr. Alvarez's interviews with each parent led her to conclude that Erik's home was a better environment for C.V. Her impressions were that Erik was truthful but that Monica was not. Monica's statements were riddled with inconsistencies, and Monica frequently denied or masked "problems, pathology, and personality difficulties." Monica suffers from some psychopathologies, including frequent untruthfulness, agenda-driven interactions with others, "under-report[ing] the common faults that the vast majority of the adult population readily admits having," moderate anxiety, somatization, possible depression, "attention-seeking and dramatic," and narcissism. But Erik has no "significant psychological disorders," save for some narcissism and obsessive-compulsive behaviors. Also, Shannon, who lives with Erik, and Erik's parents, who live nearby, are involved in C.V.'s life, and C.V. enjoys spending time with them.

Monica raises some of C.V.'s prior complaints about Erik's other sons hurting him and about not feeling comfortable around Shannon. Notwithstanding these concerns, Monica testified that she no longer believes that C.V. is unsafe in

Erik's care or that Erik's visitation must be supervised. She also faults Dr. Alvarez's failure to interview Shannon and the other children and complains that her final report was issued about a year before trial. These complaints go to Dr. Alvarez's credibility, which we may not second-guess. *See Epps*, 537 S.W.3d at 243; *Martinez*, 2011 WL 2112806, at \*4; *Hatteberg*, 933 S.W.2d at 530.

This factor favors Erik.

### H. Monica's acts or omissions that indicate that the current custodial placement is improper

Dr. Alvarez's opinions about Monica's attempts to alienate C.V. from his father also bear on this factor, as does Monica's surreptitiously recording all of C.V.'s phone calls with Erik.

Monica points to Erik's 2005 and 2006 convictions for family violence against her and C.V.'s statements that he was afraid of Erik. The family-violence convictions are troubling, but the trial court hearing a custody-modification request may focus on evidence concerning conduct since the date of the order sought to be modified, rather than conduct occurring before that date. *See, e.g.*, *Dowell v. Dowell*, 276 S.W.3d 17, 23 (Tex. App.—El Paso 2008, no pet.); *In re W.R.M.D.*, No. 10-07-00046-CV, 2007 WL 3025024, at \*1 (Tex. App.—Waco Oct. 17, 2007, no pet.) (mem. op.); *Scroggins v. Scroggins*, 753 S.W.2d 830, 832 (Tex. App.—Houston [1st Dist.] 1988, no writ). And C.V.'s statements that he was afraid of his

father were the kinds of statements that Dr. Alvarez found to be planted by his mother in order to alienate him from his father.

This factor favors Erik.

**I.    Excuses for Monica's acts or omissions that indicate that the current custodial placement is improper**

Monica offers no excuses for her alienating conduct. She points only to Erik's conduct. This factor therefore favors in Erik.

In sum, of the nine best-interest factors, seven favor Erik, and only one favors Monica. Her alienating conduct played a central role in Dr. Alvarez's custody recommendation. And the trial court could have reasonably concluded that Dr. Alvarez's opinion about Monica's untruthfulness undermined Monica's credibility. So while Monica has done much good in her parenting, the trial court reasonably could have concluded that her intentional and repeated alienation of C.V. from his father strongly suggested that custody should be modified. We hold that the evidence before the trial court was legally sufficient to support the order modifying custody in Erik's favor because we cannot say that a reasonable person could not have reached the same judgment on the same facts. *See Stamper*, 254 S.W.3d at 542. We also hold that the evidence was factually sufficient because the evidence supporting the modification was not so contrary to the overwhelming weight of the evidence as to make the order clearly wrong or unjust. *See Epps*, 537 S.W.3d at 243.

## III. The trial court did not err in applying its discretion to the evidence

Under the second prong of abuse-of-discretion review, Monica offers several reasons why she believes Dr. Alvarez's testimony was not credible—Dr. Alvarez ignored C.V.'s therapist's deposition testimony, Dr. Alvarez's methodology was flawed, C.V.'s therapist is more credible than Dr. Alvarez, Dr. Alvarez never interviewed Shannon or her and Erik's children, and Monica's personal therapist reached different conclusions about her mental health. But these observations concern Dr. Alvarez's credibility, which the trial court was within its discretion to judge favorably.[3] The same goes for Monica's contention that the "judge put too much weight towards the amicus attorney opinion."[4]

---

[3] Monica also contends that Dr. Alvarez violated Family Code subsections 107.108(a), (c), and (e). But she does not explain how Dr. Alvarez allegedly failed to conform with the applicable standard of care for her licensure and any guidelines adopted by the authority that licensed her (subsection (a)), to "follow evidence-based practice methods and [to] make use of current best evidence" (subsection (c)), or to verify the fact statements in her report (subsection (e)). Both Dr. Alvarez's report and her testimony reveal the sources for her opinions. Monica forfeited her Family Code section 107.108 contentions by inadequately briefing them. *See* TEX. R. APP. P. 38.1(i).

[4] Monica complains that the amicus attorney violated Family Code subsections 107.005(a) and (b). But she does not explain how the amicus attorney failed to interact with C.V. or the court or failed to study the relevant American Bar Association child-representation standards. She therefore forfeited those complaints. *See* TEX. R. APP. P. 38.1(i).

We cannot say that the trial court made an unreasonable decision by ruling for Erik. *See Stamper*, 254 S.W.3d at 542. We overrule Monica's third and fourth issues.

## Conclusion

We affirm the trial court's order.

Harvey Brown
Justice

Panel consists of Chief Justice Radack and Justices Brown and Caughey.